[No. H031583. Sixth Dist. Apr. 28, 2009.]

Y.K.A. INDUSTRIES, INC., Cross-complainant and Appellant, v. REDEVELOPMENT AGENCY OF THE CITY OF SAN JOSE et al., Cross-defendants and Respondents.

## Counsel

Law Offices of Schreiber & Schreiber, Inc., Edwin C. Schreiber and Eric A. Schreiber for Cross-complainant and Appellant.

Richard Doyle, City Attorney, George Rios, Assistant City Attorney, and Robert Fabela, Deputy City Attorney, for Cross-defendants and Respondents.

## Opinion

**DUFFY, J.**—Appellant Y.K.A. Industries, Inc. (YKA), appeals from the trial court's summary judgment in favor of the Redevelopment Agency of the City of San Jose[1] (Agency) and Nina Grayson, a city employee, on YKA's cross-complaint. In a single cause of action, YKA, a subcontractor on an Agency-approved housing project, alleged a claim against the Agency and Grayson for "deprivation of due process under color of state law" pursuant to 42 United States Code section 1983[2] based on the Agency's having asserted a prevailing wage violation against YKA in connection with the construction of the project.[3] YKA sought general and punitive damages and statutory attorney fees. The trial court granted the Agency and Grayson's motion for summary judgment on the claim. The court concluded that YKA had failed to exhaust mandatory judicial remedies—in the form of a petition for writ of mandate to compel the Agency to afford an evidentiary hearing—before filing a legal action for federal civil rights violations and that the doctrine of exhaustion of judicial remedies therefore barred the action.

YKA appeals, contending that the Agency and Grayson failed to meet their burden on the motion of demonstrating their entitlement to summary judgment as a matter of law. Because there is no evidence in the record of

---

[1] This Agency is described in the record as "a public body, corporate and politic, exercising governmental functions and powers, . . . organized and existing under Chapter 2 of the Community Redevelopment Law of the State of California (Health & Saf. Code, § 33000 et seq.)."

[2] All references to section 1983 are to title 42 of the United States Code section 1983.

[3] The cross-complaint named other parties as explained below but they are not relevant here.

administrative proceedings that possessed a judicial character and yielded a result adverse to YKA that could have been the subject of review in mandate, and secondarily because the Agency and Grayson offered no evidence that YKA had failed to proceed in mandate even if the doctrine of exhaustion of judicial remedies were to apply, we agree and reverse.

## STATEMENT OF THE CASE

### I. *Factual Background*[4]

In April 2000, the Agency entered into a disposition and development agreement (DDA) with developer San Jose/Mission Villas, LLC, apparently a subsidiary of the parent company Goldrich & Kest Industries, LLC,[5] to facilitate redevelopment by public and private action of the Park Townsend redevelopment housing project in downtown San Jose (the project). According to the DDA, the Agency would provide specified funds for remediation and construction of offsite improvements and would convey the property to the developer. The developer was to construct public improvements in the offsite areas of the project in the nature of sidewalks, curbs, and gutters and would also perform design, development, and construction of residential improvements and parking facilities on the site.[6]

The total cost of the project was listed in the DDA at $40,293,645. The developer would obtain financing and pay for development and construction of the improvements, with the Agency contributing specified cash "assistance" dedicated to offsite public improvements and remediation and other "assistance" in the form of land contribution. This assistance was described in the DDA as "Agency Land Assistance" (valued at $2,621,892), "Agency Off-Site Assistance" ($1.4 million cash), and "Agency Remediation Assistance" ($600,000 cash), for a total Agency contribution of $4,621,892.[7]

---

[4] We take the facts from YKA's cross-complaint and from the evidence presented in support of and in opposition to the motion for summary judgment.

[5] San Jose/Mission Villas, LLC, apparently later changed its name to Park Townsend, LLC. We will collectively refer to this entity, under either name, and Goldrich & Kest, LLC, as "developer."

[6] The onsite improvements were not designated as a public work but the Agency determined that the offsite public improvements as defined in the DDA were "so interwoven and interrelated to the improvements on the Site that it [would be] impractical and not economical for them to be constructed separately by the Agency or put to public bid, and that therefore said Public Improvements should be constructed by the Developer, together with the Developer's improvements on the Site."

[7] These stated amounts of the Agency's offsite and remediation assistance included contingencies that would not necessarily be required to be paid, depending on actual costs as development ensued. It is not clear from the record whether these contingencies were ever required to be paid.

The developer was required under the DDA to submit to the Agency copies of all contracts with a general contractor, as well as copies of subcontracts with finish work and major subcontractors. The Agency retained the right to review and approve these documents in accordance with the DDA's schedule of performance. Failure of the Agency to timely indicate its approval of contracts and subcontracts, among other matters, resulted in these matters being "deemed approved."

The DDA also required the developer to "pay, or cause to be paid, applicable prevailing rates of wages for all residential construction work done in connection with the development of the Site." Prevailing wages were described as wages paid under a collective bargaining agreement with a recognized union representing workers who perform that type of construction work, or in the absence of a collective bargaining agreement, not less than the prevailing wage set forth at section 1773.1 of the Labor Code, the California Code of Regulations (tit. 8, § 16000 et seq.), and as established by the Director of California's Department of Industrial Relations or, alternatively, by the City of San Jose's Office of Equality Assurance. The DDA did not contain an administrative or internal procedure or method for enforcement of the prevailing wage clause or for determining its alleged violation.

The DDA further required the developer to establish a retention provision in all contracts and subcontracts for the project that was consistent with current industry practice. The provision would require the developer to withhold a minimum of 5 percent of payments due contractors "until the obligations of the contractor are satisfactorily completed."

In or about July 2001, the developer, as general contractor, entered into a written subcontract with YKA for the installation of interior cabinets onsite at the project.[8] The contract did not contain a term requiring YKA to pay prevailing wages to its workers. At the time YKA entered into the subcontract, it had not been provided with a copy of the DDA and was not then aware of that document's prevailing wage provision.

Under its subcontract, YKA constructed the cabinets in Southern California, where its business is located. In or around the summer of 2003, YKA orally contracted with four local "installers," whom it regarded as independent contractors, to install the cabinets at the project site. One of the installers was to act as YKA's foreman on the job. The installers were hired on a "piecework" basis, meaning that they were to be paid by YKA a set amount for each cabinet installed. But the installers were required to submit weekly time and progress sheets to YKA to substantiate and document their work, which began around August 2003.

---

[8] The subcontract is not included in the record.

Also in August 2003, the Agency entered into a written agreement with the City of San Jose's Office of Labor Compliance (Office),[9] which was then headed by Nina Grayson as director.[10] The agreement called for the Office to provide and be reimbursed for labor compliance services, including services relating to prevailing wage compliance, on Agency-approved public and private projects for the fiscal year 2003–2004. The Agency was to provide the Office with all contracts and other relevant documents for projects approved by the Agency, which included the project at hand. In April 2004, the Agency and the Office entered into a similar contract for the same services for the fiscal year 2004–2005.[11] Both contracts provided that the labor compliance services were to be in accordance with the Office's "standard practices as required by Council policy[12] and the California Labor Code based on authorized staffing levels."

But neither agreement specified or referred to any particular practices or council policies; they did not specify any administrative or internal procedures to govern labor compliance activities provided; and they did not refer to specifically applicable sections of the Labor Code in this regard. Nor did they identify or correlate specific staffing levels with particular provisions of the Labor Code or particular council policies. In other words, neither agreement provided for any form of adjudicative or administrative process to govern the Office's determinations of a party's failure to comply with labor standards, including determinations by the Office of a prevailing wage violation by a contractor or subcontractor. Nina Grayson understood that the Office's personnel would conduct "an investigation in which [they would] talk to the workers, talk to the contractor, and arrive at a conclusion." In the event of a dispute, the Office would "afford contractors an opportunity to come in and meet . . . to discuss a finding of noncompliance, and [they would be] afforded the opportunity to bring additional information forward to look at." But she did not understand there to be any procedure in place whereby a party adversely affected by the Office's determination of a prevailing wage violation on an Agency project could request a hearing or be provided with any form of adjudicatory or administrative process or review of that determination. If a contractor was "not happy" with a determination made by the

---

[9] The office that Grayson headed is described in the record both as the Office of Equality Assurance and the Office of Labor Compliance. We cannot ascertain on this record a functional or actual difference between the two and therefore make reference to both as the "Office." If there are any such differences, they are irrelevant to our opinion.

[10] The contract was technically between the Agency and the city's Department of Public Works through its Office of Labor Compliance but for all functional purposes, the Office appears to have been the contracting party.

[11] See preceding footnote.

[12] We assume but cannot confirm on this record that this referred to unspecified policies of the San Jose City Council.

Office, "they could write to the city manager" but once the Office was "comfortable" with its own determination, that was "pretty much it."

In November 2003, Nina Grayson, in her capacity of director of the Office, had not yet been provided with a copy of the YKA subcontract with the developer on the project and she was operating under the incorrect assumption that the subcontract contained a prevailing wage clause. After her staff had made a site visit, she became aware of allegations that YKA "had failed to pay prevailing wages to a number of workers." She initiated an investigation into the allegations and, in December 2003,[13] the Agency notified YKA that it was required to pay its workers "prevailing hourly wage for their work at the Project." YKA protested that it was not required to pay prevailing wages by contract or any other authority and expressed its belief that its workers' claimed hours were "phony and severely overstated."

In March 2004, Grayson requested the developer to withhold "sufficient retention" from YKA until the investigation was complete.[14] She also informed the developer that if there were a prevailing wage violation, YKA's workers would have to be made "whole" as quickly as possible so that the requirements of the DDA were met, a responsibility that was ultimately to be borne by the developer, who, unlike YKA, was in privity of contract with the Agency and bound by that agreement.

By April 2004, the Office, through Grayson, had concluded that YKA's workers had not been paid prevailing wages on the project and she again wrote to the developer, this time requesting that restitution be paid to the four workers by YKA by April 16, 2004, in calculated amounts representing "the difference between what was reported on the certified payroll records and the actual hours worked" for a total of $93,027.32. In late April, YKA's counsel objected by letter to Grayson,[15] to which she responded on May 25, 2004. She pointed out that while YKA's workers had been paid on a piecework basis, they had kept logs of their time, from which the restitution amounts owed to each worker were calculated. Grayson requested that YKA pay these amounts to its workers in the form of cashier's checks delivered to the Office by June 14, 2004. If YKA failed to make payment, Grayson threatened that the developer, instead of YKA, would have to make restitution and "issue 1099s to the affected workers." At the time, Grayson was still unaware of the fact that YKA's subcontract did not contain a prevailing wage clause, despite the Agency's presumably having reviewed and approved of the subcontract

---

[13] It appears from the record that by December 2003, at least one of YKA's installers had initiated a wage claim with the Department of Industrial Relations that YKA may later have settled but the record is incomplete in this regard.

[14] YKA's installation work on the project was apparently complete by March 30, 2004.

[15] The letter is not included in the record.

under the DDA and its obligation to provide Grayson's office with copies of all contracts on Agency projects for which the Office was to provide labor compliance services.

On June 10, 2004, YKA's counsel again wrote to Grayson. Among other things, he informed her that YKA's subcontract did not contain a prevailing wage clause and he requested a "thorough but fair investigation and [an] evidentiary hearing" on YKA's behalf.

On June 30, 2004, Grayson informed the developer that YKA had failed to make the restitution payments to its workers by the previously imposed June 14, 2004 deadline. By this time, Grayson acknowledged that the YKA subcontract did not contain a prevailing wage clause and she therefore requested the developer to make the restitution payments directly to YKA's workers as required by the DDA by July 9, 2004. On July 13, 2004, YKA's counsel again requested from Grayson a "full and fair evidentiary hearing before a neutral factfinder" absent which, he informed her, the matter would proceed to litigation.

The developer failed to make the direct payments to YKA's workers by the July 9 deadline and on July 15, 2004, Grayson again wrote to YKA's counsel informing him that the Agency was looking to the developer and not YKA to make the payments, this time by the new deadline of July 30, 2004, on pain of further unspecified action by the Agency. On July 16, 2004, she wrote to the developer to indicate the same thing. The developer responded that same day, asserting that even though YKA's subcontract did not contain a prevailing wage clause, it had bid the project in accordance with prevailing wages, which YKA was therefore expected to pay and which amounts would be taken or withheld from "YKA's contract amount." The developer acknowledged a dispute between YKA and its workers about the wages owed but it "instructed YKA to prepare checks to the affected employees" by the following week. At the same time, it urged the Agency not to disburse the funds to the workers before employing "means or procedures by which a resolution" could be reached of this "honest dispute." Even though its subcontract did not contain a prevailing wage clause, YKA then forwarded to Grayson under protest restitution checks to its workers by letter of July 19, 2004, but the amounts of the checks were less than that calculated to be due by the Agency.

In late July 2004, Grayson met with representatives of the developer and YKA. According to Grayson, the "purpose of that meeting was to allow YKA an opportunity to provide additional information regarding [the] investigation into allegations of prevailing wage violations at the Project." She followed up

after the meeting by letter to the developer in which she identified remaining amounts of restitution due YKA's workers, which she demanded be paid by July 30, 2004.

Again, even though its subcontract lacked a prevailing wage clause, YKA paid the full amount of restitution as calculated by Grayson by August 4, 2004, still under protest. According to the Agency, at no point did it withhold any amount of retention from the developer on the project due to an alleged or actual prevailing wage violation. According to YKA, the Agency demanded the developer to withhold "somewhere between $150,000 and $200,000 from YKA in order to ensure that YKA complied with [the Agency's] prevailing wage determinations" and the developer in fact withheld "sums in excess of $93,000" until YKA "paid the money to the workers pursuant to [the Agency's] mandate."[16]

## II. *Procedural Background*

YKA filed its cross-complaint on June 24, 2005.[17] As against the Agency and Grayson, it alleged a single cause of action for "deprivation of due process under color of state law" in violation of the federal Civil Rights Act of 1971, section 1983.[18] The charging allegations pleaded that the Agency and Grayson unlawfully "1. Demanded YKA pay prevailing wages to persons, despite the fact that there is no law or ordinance in San Jose requiring the payment of such wages on a public works contract, nor was there any contract requiring YKA to pay such wages; 2. Refus[ed] to [provide] YKA notice and an opportunity to be heard before a neutral body, [to] present evidence or confront witnesses before depriving YKA of property without due process of law; and 3. Us[ed] and exert[ed] unfair and unlawful pressure by threatening to withhold money far in excess of any actual or potential claim in an effort to force YKA to make payments it was not required to make."

---

[16] Why YKA paid any of the demanded amounts is not clear from the record. YKA contends that it did so under economic pressure from the Agency exerted through the developer but whether the Agency exerted such pressure through the withholding of contract or retention funds from the developer is disputed, as we set out. Neither is it clear from the record that if the developer actually withheld funds from YKA, that it did so at the Agency's continued direction after Grayson realized the absence of a prevailing wage provision in YKA's subcontract.

[17] The action was initiated by complaint against YKA filed by its former worker who had been hired as foreman for YKA's work on the project. YKA's cross-complaint included causes of action against its four former workers for fraud, negligent misrepresentation, breach of contract, and breach of fiduciary duty but these claims are not relevant to this appeal. YKA did not name the developer as a cross-defendant.

[18] YKA initially named the City of San Jose as cross-defendant instead of the Agency but this error was corrected by stipulation and order substituting the Agency in place of the city without the need for filing additional pleadings.

The cause of action further alleged that the Agency had in fact withheld "an amount in excess of five times the amount in controversy in an effort to exert pressure and force YKA to pay sums it did not owe" and that YKA had repeatedly requested from the Agency and Grayson to be provided with a hearing or an opportunity to present evidence and that it was just as repeatedly denied these basic aspects of due process with threats of extortion employed instead. The claim also specifically alleged that there was "no requirement of exhaustion of administrative or state court remedies required to bring [the] action." The cross-complaint prayed for general and punitive damages as well as statutory attorney fees on the cause of action, and for other relief deemed necessary and proper.

In July 2006, the Agency and Grayson moved for summary judgment on YKA's cross-complaint under Code of Civil Procedure section 437c.[19] They contended that they were entitled to summary judgment or adjudication because (1) YKA was precluded from recovering damages under 42 United States Code section 1983 as "it did not first exhaust judicial remedies"; (2) any "withholding of payments to YKA did not occur under color of state law"; (3) "YKA had an adequate post-deprivation remedy by seeking recovery from the [developer]"; and (4) Grayson "[was] immune from suit, as she performed her duties in good faith." (Capitalization omitted.) With respect to their first contention, the Agency and Grayson included nothing in their moving papers by way of argument or evidence regarding the character of the factfinding process used or the adjudicatory basis for applying the doctrine of exhaustion of judicial remedies in this case. In other words, the application of this doctrine was assumed with no evidentiary basis or legal analysis for its application offered.

The separate statement of undisputed facts filed in support of the motion included nine facts. They were in essence that (1) the Agency had entered into the DDA with the developer; (2) the DDA required the developer to pay, or cause to be paid, prevailing wages on the project; (3) the developer later entered into a subcontract with YKA for installation of cabinetry onsite at the project; (4) YKA's subcontract did not include a prevailing wage provision; (5) the Agency and the Office, whose director was Grayson, entered into an agreement for the Office to provide labor compliance services on Agency-approved projects, including the subject project; (6) in late 2003, allegations arose that YKA's workers on the project were not being paid prevailing wages; (7) Grayson investigated the prevailing-wage-violation allegations; (8) she determined based on the investigation that YKA had not paid prevailing wages to its four workers on the project; and (9) Grayson later informed the developer and YKA that it was the developer's responsibility, and not that of YKA, to pay YKA's workers prevailing wages.

---

[19] Further statutory references are to the Code of Civil Procedure unless otherwise specified.

YKA opposed the motion. With respect to the moving parties' argument that YKA's failure to exhaust judicial remedies was fatal to its claim, the opposition contended that the motion had not established as a matter of undisputed fact that YKA had not first proceeded in mandate before filing suit. The opposition did not assert that YKA had indeed petitioned for a writ of mandate but it stressed that any failure to have done so was not included as an undisputed fact in the moving parties' separate statement and, further, that there had been no evidence whatsoever presented on the point. YKA argued that as a consequence, the Agency and Grayson, as moving parties, had failed to meet their burden on the motion with respect to this issue. YKA argued similarly that no evidence had been presented as to whether the project was a "public works" project or not under Labor Code section 1770 as that statute existed when the DDA was executed.[20]

YKA's own separate statement in opposition to the motion admitted that the moving parties' nine facts were undisputed. It also offered nine additional facts that it urged were likewise undisputed. These were that (1) Grayson did not determine until several months into her investigation that YKA's subcontract did not include a prevailing wage provision, which excused YKA from having to pay prevailing wages; (2) Grayson nevertheless insisted that the developer withhold monies due YKA under the subcontract to cover what she calculated was due YKA's workers as restitution; (3) Grayson by policy makes the final determination of a prevailing wage violation and calculates the resulting amounts due; (4) this policy does not afford a contractor the right to an evidentiary hearing or the opportunity to cross-examine witnesses; (5) there is no appeal or review process through which a contractor can challenge a prevailing-wage-violation determination made by Grayson except perhaps for the contractor to bring the matter to the attention of the city manager; (6) YKA had informed Grayson and the Agency in two letters that its subcontract did not contain a prevailing wage clause; (7) YKA also twice demanded in writing that it be provided with an evidentiary hearing or other manner in which to contest the claims of its workers and these demands were denied by Grayson and the Agency; (8) the developer informed YKA that the Agency and Grayson had insisted that the developer withhold contract sums due YKA to cover restitution amounts due by reason of the prevailing wage violation; and (9) the developer in fact withheld from YKA substantially more than $93,000—the amount in controversy over prevailing wages—at the insistence of the Agency and YKA.

In reply, the Agency and Grayson contended among other things that YKA bore the burden of establishing that it had petitioned in mandate before filing

---

[20] This issue would bear on any statutory duties to pay prevailing wages on the project under the Labor Code as opposed to any contractual obligation to do so.

suit in order to defeat the motion, notwithstanding that they had not included any evidence on the subject in their moving papers.

The matter was submitted without argument at the hearing. The court granted summary judgment from the bench "based on [YKA's] failure to submit a petition for writ of mandate to compel a hearing, fatal to a claim of due process violation." The court's later written order stated that summary judgment was granted based on YKA's "failure to file a petition for writ of mandate compelling [cross-]defendants to provide an evidentiary hearing with regard to the issue of prevailing wages. In response to [cross-]defendants' motion for summary judgment, which motion argued but did not present any specific evidence that YKA [had] failed to file a petition for writ of mandate compelling [cross-]defendants to provide an evidentiary hearing on the issue of prevailing wages, YKA failed to present evidence that it ever filed such a writ of mandate petition."

Judgment was later entered in favor of the Agency and Grayson on YKA's cross-complaint and YKA's timely appeal from the judgment followed.

## DISCUSSION

### I. *Legal Framework and Standard of Review*

We set forth in some detail the legal framework of the law concerning summary judgment that governs our review because we view the trial court to have gone astray here in applying it.

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) The procedure is drastic and should be used with caution in order that it not become a substitute for existing methods in the determination of issues of fact. (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143 [29 Cal.Rptr.3d 144].) Under the summary judgment statute, the moving papers must demonstrate that "material facts" are undisputed and that the movant is entitled to judgment as a matter of law. (§ 437c, subds. (b)(1), (c).) The moving party's papers are strictly construed whereas those of the opposing party are liberally construed, with all doubts about the granting of the motion resolved in favor of the opposing party. (*Trop v. Sony Pictures Entertainment, Inc., supra*, 129 Cal.App.4th at p. 1143.)

In determining the existence of a triable issue of material fact, the court must consider all admissible evidence on the motion, except that to which

objections have been sustained, and "all inferences reasonably deducible" therefrom, except that summary judgment may not be granted based on such inferences if they are contradicted by other inferences or evidence that raises a triable issue of fact. (§ 437c, subd. (c).)

A cause of action has no merit under section 437c, subdivision (*o*), "if either of the following exists: [¶] (1) One or more of the elements of the cause of action cannot be separately established, even if that element is separately pleaded[, or] [¶] (2) [a] defendant establishes an affirmative defense to that cause of action." (See *Aguilar, supra*, 25 Cal.4th at p. 853.) The party moving for summary judgment bears "the burden of persuasion" that there are no triable issues of material fact and that the moving party is entitled to judgment as a matter of law. (*Id*. at p. 850.) This burden remains with the moving party. (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 746–747 [73 Cal.Rptr.3d 114].) This party also "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; *if* he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar, supra*, 25 Cal.4th at p. 850, italics added.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id*. at p. 851.)

Thus, as here, when a defendant moves for summary judgment, he must make a prima facie showing, i.e., "he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Aguilar, supra*, 25 Cal.4th at p. 851, fn. omitted.) A defendant need not "conclusively negate an element of the plaintiff's cause of action" (*id*. at p. 853, fn. omitted) so long as the defendant shows that the element cannot be established, for example, "by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" (*id*. at p. 854).

The moving party must satisfy his or her initial burden before the opposing party must controvert anything. (§ 437c, subd. (p)(1), (2).) Accordingly, a moving defendant who claims that the plaintiff cannot prove all the elements of his case must present evidence in support of this claim. The defendant cannot simply challenge the plaintiff to prove his case by opposition. (*Aguilar, supra*, 25 Cal.4th at pp. 854–855.) In other words, "a plaintiff resisting a motion for summary judgment bears no burden to establish any element of his or her case unless and until the defendant presents evidence either affirmatively *negating* that element (proving its absence in fact), or affirmatively showing that the plaintiff does not possess and cannot acquire evidence

to prove its existence." (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 107 [16 Cal.Rptr.3d 717].) Where the evidence submitted by a moving defendant does not support judgment in his favor, the court must deny the motion without looking at the opposing evidence, if any, submitted by the plaintiff. (*Hawkins v. Wilton* (2006) 144 Cal.App.4th 936, 940 [51 Cal.Rptr.3d 1].)

The court's "primary function [in evaluating a summary judgment motion] is to identify issues rather than to determine [them]. [Citation.] . . . If the evidence is in conflict, the factual issues must be resolved by trial." (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 839 [89 Cal.Rptr.2d 540].) Thus, should the court determine that triable issues of fact exist, the summary judgment motion must be denied. (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1448 [111 Cal.Rptr.2d 534].) "There is to be no weighing of the evidence." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 880 [116 Cal.Rptr.2d 158].)

Because summary judgment motions involve purely questions of law, we review the grant of summary judgment de novo. (*Chavez v. Carpenter, supra*, 91 Cal.App.4th at p. 1438.) In performing our independent review, we conduct the same procedure used by the trial court. We examine (1) the pleadings to determine the elements of the claim for which the party seeks relief; (2) the summary judgment motion to determine if movant established facts justifying judgment in its favor; and (3) the opposition to the motion— assuming movant met its initial burden—to "decide whether the opposing party has demonstrated the existence of a triable, material fact issue. [Citation.]" (*Id.* at p. 1438; see also *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252–1253 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)

## II. *Respondents Did Not Establish Their Right to Summary Judgment Below*

As noted, the trial court's sole stated reason in its written order for granting summary judgment was its determination that YKA, by opposition, bore the burden of demonstrating that it had pursued proceedings in mandate before filing this 42 United States Code section 1983 action and it had failed to meet that burden. This, even though the moving parties had not demonstrated that the doctrine of exhaustion of judicial remedies even applies on the facts of this case. Or, assuming it does apply, they failed to include either a fact in their moving separate statement or evidence on the motion establishing that YKA had indeed failed to first proceed in mandate.

### A. The Doctrine of Exhaustion of Judicial Remedies As Applied—Overview

Inherent in the trial court's ruling was the conclusion, based solely on the due-process-violation component of YKA's claim, that the specific cause of action against the Agency and Grayson was subject to the doctrine of exhaustion of judicial remedies. The perfunctory application of this doctrine was argued by the moving parties, relying principally on *Briggs v. City of Rolling Hills Estates* (1995) 40 Cal.App.4th 637 [47 Cal.Rptr.2d 29] (*Briggs*); *Mobley v. Los Angeles Unified School Dist.* (2001) 90 Cal.App.4th 1221 [109 Cal.Rptr.2d 591] (*Mobley*); and *DeCuir v. County of Los Angeles* (1998) 64 Cal.App.4th 75 [75 Cal.Rptr.2d 102] (*DeCuir*).

The doctrine of exhaustion of judicial remedies, as explained by the court in *Knickerbocker v. City of Stockton* (1988) 199 Cal.App.3d 235, 240–244 [244 Cal.Rptr. 764], is distinct from the jurisdictional rule that requires exhaustion of administrative remedies before filing suit in certain circumstances. "Rather it is a form of res judicata, of giving collateral estoppel effect to the administrative agency's decision, because that decision has achieved finality due to the aggrieved party's failure to pursue the exclusive *judicial* remedy for reviewing administrative action."[21] (*Briggs, supra*, 40 Cal.App.4th at p. 646, fn. omitted; see also *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 484 [131 Cal.Rptr. 90, 551 P.2d 410] (*Westlake*).)

The doctrine of exhaustion of judicial remedies is invoked where there has been a quasi-judicial adjudication by an administrative tribunal, whether in the public or private context. It requires a party aggrieved by such a decision to petition for relief in mandate in order to challenge the administrative action or findings before filing a legal action so as to prevent the adverse action or findings on issues actually litigated from taking on preclusive effect. (*McDaniel v. Board of Education* (1996) 44 Cal.App.4th 1618, 1621 [52 Cal.Rptr.2d 448]; *Westlake, supra*, 17 Cal.3d at p. 484 [unless party to a quasi-judicial proceeding challenges adverse findings made in that proceeding through mandamus, those findings are binding in a later civil action]; *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 69–70 [99

---

[21] " ' "Res judicata" describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, "precludes relitigation of issues argued and decided in prior proceedings." ' [Citation.]" (*Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1507 [83 Cal.Rptr.3d 607], fn. omitted.) Collateral estoppel, or issue preclusion, has been described as a species of the doctrine of res judicata. (*Id.* at p. 1507, fn. 5, citing *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 [123 Cal.Rptr.2d 432, 51 P.3d 297] [doctrine of collateral estoppel is one aspect of the concept of res judicata though each has a distinct meaning].)

Cal.Rptr.2d 316, 5 P.3d 874] (*Johnson*) [FEHA (Cal. Fair Employment and Housing Act; Gov. Code, § 12900 et seq.) action that challenges decision of quasi-judicial proceeding is barred unless plaintiff first challenged decision through mandamus]; *Rojo v. Kliger* (1990) 52 Cal.3d 65, 86 [276 Cal.Rptr. 130, 801 P.2d 373] [doctrine of judicial exhaustion applies to situations involving public or private organizations whose quasi-judicial determination was the result of internal rules or regulations]; accord, *Gupta v. Stanford University* (2004) 124 Cal.App.4th 407, 411–412 [21 Cal.Rptr.3d 192]; *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1722–1731 [53 Cal.Rptr.2d 662].) Once an administrative decision has been issued, "provided that decision is of a sufficiently judicial character to support collateral estoppel, respect for the administrative decisionmaking process requires that the prospective plaintiff continue that process to completion, including exhausting any available judicial avenues for reversal of adverse findings. [Citation.] Failure to do so will result in any quasi-judicial administrative findings achieving binding, preclusive effect and may bar further relief on the same claims. [Citation.]" (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 113 [84 Cal.Rptr.3d 734, 194 P.3d 1026].)

■ The purpose underlying the doctrine of exhaustion of judicial remedies is to prevent an aggrieved party from being able to avoid the preclusive effects of an adverse administrative action by simply forgoing the right to judicial review by failing to proceed in mandate. If the party initially pursues a claim in an administrative forum in which the party has an adequate opportunity to litigate disputed issues, the party will suffer preclusive effects of an adverse decision or findings in a later action if it fails to seek judicial review of the administrative decision in state court through mandamus. (*Miller v. County of Santa Cruz* (9th Cir. 1994) 39 F.3d 1030, 1033–1034, fn. 3 [failure to challenge upholding of employment termination by county civil service commission by proceeding in mandate precluded later civil rights claim because res judicata and collateral estoppel principles afforded preclusive effect to commission's findings]; *Misischia v. Pirie* (9th Cir. 1995) 60 F.3d 626, 628–629.)

■ But there are conditions or predicates to the doctrine's application. These are that there must have been a prior administrative proceeding and that proceeding must have possessed the requisite judicial character such that res judicata or collateral estoppel principles may be fairly invoked against a claimant in a later action. A prior decision precludes relitigation of an issue under the doctrine of collateral estoppel only if two prongs of that doctrine are met. First, five threshold requirements must be satisfied: " 'First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and

on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.] The party asserting collateral estoppel bears the burden of establishing these requirements.' [Citation.]" (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943 [38 Cal.Rptr.3d 220, 126 P.3d 1040] (*Pacific Lumber*).) If all of these threshold requirements of collateral estoppel are met, the analysis determining whether that doctrine applies to give preclusive effect then looks to " 'the public policies underlying the doctrine before concluding that [it] should be applied in a particular setting.' [Citation.]" (*Id.* at p. 944; see *State Bd. of Chiropractic Examiners v. Superior Court* (*Arbuckle*) (2009) 45 Cal.4th 963, 974–978 [89 Cal.Rptr.3d 576, 201 P.3d 457] [exhaustion of judicial remedies does not apply collateral estoppel principles to bar later action where statute provides parallel, independent remedy in the form of action for damages].)

██ If these two prongs of the collateral estoppel test are both satisfied, then the doctrine of exhaustion of judicial remedies may be applied to give preclusive effect to a decision of an administrative agency *if* the prior proceedings and decision "possess a judicial character." (*Pacific Lumber, supra,* 37 Cal.4th at p. 944.) "For an administrative decision to have collateral estoppel effect, it and its prior proceedings must possess a judicial character. [(*People v. Sims* (1982) 32 Cal.3d 468, 479 [186 Cal.Rptr. 77, 651 P.2d 321].)] Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision. [Citation.]" (*Ibid.*; see *State Bd. of Chiropractic Examiners v. Superior Court, supra,* 45 Cal.4th at pp. 975–976 [writ review of adverse administrative decision is generally required before pursuing other remedies and if proceeding possessed requisite judicial character, then the decision will be binding in later civil action].)

The doctrine of exhaustion of judicial remedies may apply in many contexts, among them actions for civil rights violations where there has been a prior adjudicative determination by an agency involving a plaintiff's claimed violation of the same primary right. (*Swartzendruber v. City of San Diego* (1992) 3 Cal.App.4th 896, 903–904, 909 [5 Cal.Rptr.2d 64] [failure of police officer to challenge decision of city civil service commission to uphold discharge by mandamus precluded later-asserted action in tort and for federal civil rights violations as plaintiff was bound by unreviewed administrative findings involving same primary right], disapproved on another ground in *Johnson, supra,* 24 Cal.4th at p. 72.)

In *Briggs*, the Agency and Grayson's leading case here, the plaintiffs brought an action for civil rights violations under 42 United States Code section 1983 after the city, through its planning commission and city council, required that they remove an unapproved patio deck that intruded on a neighbor's privacy as a condition to the city's issuance of a permit allowing the plaintiffs to build a substantial addition to their house. The plaintiffs did not seek review through administrative mandamus of this condition to the permit, which had been issued after the plaintiffs had submitted to the city's administrative process that included public hearings before the planning commission and an appeal to the city council. The Court of Appeal affirmed the trial court's grant of summary judgment because the plaintiffs' section 1983 claim, which was based on the allegation that the city had wrongfully deprived them of the right to use their property by imposition of the contested condition, was precluded by their failure to have sought judicial review of the administratively imposed condition. This failure resulted in the plaintiffs' being estopped from pursuing their civil rights claim by collateral attack in a later independent civil action. (*Briggs, supra*, 40 Cal.App.4th at pp. 645–648; see also *City of Santee v. Superior Court* (1991) 228 Cal.App.3d 713, 718–719 [279 Cal.Rptr. 22] [builder's action against city was precluded by failure to challenge through mandamus city's revocation of occupancy permit based on unfulfilled condition of that permit].)

In *DeCuir*, on which the Agency and Grayson also rely, the plaintiff alleged that the county's examination process for a civil service position as a district attorney was unfair and resulted in his achieving a low exam score and not being selected for the position. The examination was given under the county's civil service commission rules, which included an internal procedure for review of administrative decisions that the plaintiff invoked. The procedure included a provision authorizing the commission to either hold an evidentiary hearing or make a decision on the merits based on a review of written materials submitted by the parties. After unsuccessful exhaustion of that procedure, and ultimately being denied a second hearing, the plaintiff filed an action for money damages against the county, bypassing any challenge to the administrative process or decision by proceeding in mandamus. (*DeCuir, supra*, 64 Cal.App.4th at pp. 76–79.)

After the plaintiff in *DeCuir* obtained a jury verdict, the defendants appealed, contending that his exclusive form of judicial review was a proceeding in mandamus, not a jury trial, because mandamus is the proper method of obtaining judicial review of most agency decisions. The Court of Appeal agreed, concluding that although a proceeding in administrative mandamus under section 1094.5 would not have been properly available because the plaintiff, who was bound by the civil service rules, had no

absolute right to a hearing before the commission under those rules,[22] his remedy was a proceeding in ordinary or traditional mandamus under section 1085 in order to compel the commission to exercise its discretion to grant the hearing he had sought. (*DeCuir, supra,* 64 Cal.App.4th at pp. 80–83.) In other words, the commission's discretionary denial of a hearing under the applicable civil service rules was itself a reviewable determination but through traditional, as opposed to administrative, mandamus. (*Id.* at pp. 82–83; cf. *Las Virgenes Educators Assn. v. Las Virgenes Unified School Dist.* (2001) 86 Cal.App.4th 1, 6–7 [102 Cal.Rptr.2d 901]; *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1391–1392 [61 Cal.Rptr.2d 297] [so long as agency is required by law to accept and consider evidence from interested parties before making its decision, § 1094.5's hearing requirement is satisfied]; *Kirkpatrick v. City of Oceanside* (1991) 232 Cal.App.3d 267, 279 [283 Cal.Rptr. 191] [administrative mandate will lie where hearing is not explicitly required by law but compelled by due process considerations].) The plaintiff in *DeCuir* thus could not bypass judicial review of the civil service commission's decision without avoiding issue or claim preclusion in a later action for damages involving the same primary right as a result of that unchallenged decision having become final. (*DeCuir, supra,* 64 Cal.App.4th at p. 83.)

In *Mobley,* also cited by the Agency and Grayson, the plaintiff, a subcontractor, brought suit against a school district, the state Division of Labor Standards Enforcement (DLSE), and four individuals in a dispute about his alleged failure to have paid prevailing wages to his workers on a public works school construction project.[23] Although the dispute was initiated by actions of the labor compliance unit of the school district, it was later

---

[22] Proceeding in administrative mandamus under section 1094.5 is the proper way to invoke judicial review of an administrative decision when the decision resulted from a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the agency. (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848 [41 Cal.Rptr.2d 567].) The court's inquiry in administrative mandamus focuses on whether substantial evidence supports the decision. (*Id.* at p. 849.) But in traditional mandamus under section 1085, which is the appropriate method of obtaining judicial review of an agency decision when these conditions are absent, the judicial inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support. (35 Cal.App.4th at p. 849.) Quasi-legislative acts, which are the formulation of a rule to be applied to future cases, are generally reviewed by ordinary mandamus while quasi-judicial acts, which involve the application of a rule to a specific set of facts, are generally reviewed by administrative mandamus. (*Id.* at p. 848, fn. 3.)

[23] Unlike here, there was no question in *Mobley* that the project was a public works project as defined under Labor Code section 1720, which is part of the prevailing wage law set forth in the Labor Code. In that setting, Labor Code sections 1771 and 1773.2 require that every worker be paid a prevailing wage. The Labor Code also now provides for procedures, including a hearing and a review process, for the determination by the Labor Commissioner of prevailing wage disputes on public works projects. (Lab. Code, §§ 1741, 1742, 1775.) In addition, title 8 of the California Code of Regulations, which concerns payment of prevailing

determined against the plaintiff by a hearing officer for the DLSE under administrative procedures set out in the California Code of Regulations.[24] The plaintiff then filed suit, seeking damages for due process and civil rights violations and relief in mandate. The trial court ultimately sustained demurrers to the complaint on various grounds, including that the petition for relief in mandate to compel a hearing before the DLSE was barred by the statute of limitations. (*Mobley, supra*, 90 Cal.App.4th at pp. 1224–1231.)

After an exhaustive analysis of the constitutionality of California's prevailing wage statutes and regulations affecting public works as considered and upheld by the United States Supreme Court in *Lujan v. G & G Fire Sprinklers, Inc.* (2001) 532 U.S. 189 [149 L.Ed.2d 391, 121 S.Ct. 1446], the Court of Appeal in *Mobley* concluded that the plaintiff could maintain a petition for writ against the DLSE to compel a hearing to determine whether a prevailing wage violation had occurred. (*Mobley, supra*, 90 Cal.App.4th at pp. 1232–1245.) The court emphasized that the United States Supreme Court in *Lujan*, citing due process concerns, had required some form of postdeprivation relief to a subcontractor after an awarding body on a public works project had directed the withholding of funds from the subcontractor by the general contractor in accordance with the prevailing wage law. (*Mobley*, at p. 1245.) The court did not determine the plaintiff's ultimate and substantive right to writ relief but concluded that his complaint that he had not received a due process hearing from the DLSE before the highest penalty was assessed for his alleged prevailing-wage violation, was properly pursued by ordinary mandamus, and that the petition was not barred by the shorter statute of limitations applicable to administrative mandamus. (*Ibid.*)

■ What all of these cases that concern the doctrine of exhaustion of judicial remedies (to varying degrees) demonstrate, including *Briggs, DeCuir,*

---

wages upon public works projects, provides a very detailed and comprehensive set of administrative procedures for the determination of prevailing wage disputes on public works. These include procedures for an awarding body on a public works project or the DLSE to issue a notice to withhold funds from a contractor or subcontractor alleged to be violating prevailing wage laws and for the contractor or subcontractor to request a hearing before the DLSE to determine whether or not reasonable cause exists for the retention of funds under Labor Code section 1727, which authorizes such withholding. (Cal. Code Regs., tit. 8, §§ 16413 & 16414.)

Although the summary judgment motion in the instant case presented the DDA, which generally explained the financial structure of the project, the motion set out no facts in its separate statement as to whether or not the project was a public works project under Labor Code section 1720 to which these statutory and regulatory procedures might apply. Nor did the parties particularly analyze this question either in the court below or on appeal. And the motion contained disputed evidence about whether the developer actually withheld funds from YKA pursuant to a directive by the Agency. We are therefore not in a position to address the applicability of these statutory and regulatory administrative procedures to this case as the source of an available adjudicatory process that might lead to the application of the doctrine of exhaustion of judicial remedies.

[24] See preceding footnote.

*Mobley*, and *Miller* as relied on by the Agency and Grayson,[25] is that the doctrine is applied in settings—unlike here, as we conclude below—in which there has been an adjudicatory, quasi-judicial decision in accordance with established public or private procedures—through statute, regulation, or contract. These cases also demonstrate that the purpose of the doctrine's application is to afford "proper respect" to those procedures by "precluding a party from circumventing the established process for judicial review of such decisions" by failing to file a petition for relief in mandate before resorting to legal action. (*Johnson, supra*, 24 Cal.4th at p. 70, citing *Westlake, supra*, 17 Cal.3d at p. 484.) Moreover, in these cases in which the doctrine of exhaustion of judicial remedies was applied—unlike here, as we conclude below—the prior administrative proceedings possessed the requisite "judicial character" such that they yielded decisions or findings that could later be given preclusive effect. (*Pacific Lumber, supra*, 37 Cal.4th at p. 944; *State Bd. of Chiropractic Examiners v. Superior Court, supra*, 45 Cal.4th at pp. 975–976.)

■ The predicates to the doctrine's application are therefore the existence or availability of an administrative process possessing a judicial character and a quasi-judicial adjudication, finding, or action adverse to the plaintiff produced therefrom. The doctrine is applied by giving preclusive effect in a later lawsuit concerning claimed violations of the same primary right to such adverse quasi-judicial, adjudicatory findings and decisions. If there is no available or established administrative process possessing a judicial character or no quasi-judicial decision or adjudicatory findings to which to give preclusive effect in a particular case, the purpose of the doctrine cannot be served, its res judicata or collateral estoppel function cannot be used as a sword or shield, and the doctrine thus cannot be applied to bar a later action on this basis. The Agency and Grayson cite no authority for the application of the doctrine to factual settings in which there was no demonstrated available adjudicatory process, let alone one possessing a judicial character, and no

---

[25] They also rely in supplemental briefing on *Mola Development Corp. v. City of Seal Beach* (1997) 57 Cal.App.4th 405, 412 [67 Cal.Rptr.2d 103] (*Mola*), which is similarly of no help to them. There, the Court of Appeal held in part that the administrative development-approval process that the plaintiffs had gone through—which had included a public hearing and which had led to the city's adverse land-use decision that was undisputedly quasi-judicial and adjudicatory in character—did not have to meet the formal requirements of the Administrative Procedure Act (Gov. Code, § 11500 et seq.) in order for the doctrine of exhaustion of administrative remedies to apply to bar the plaintiff's action for damages. (*Mola, supra*, at pp. 410, 412.) In the factual context of the case, unlike here, there was an established administrative process available that included a public hearing and an opportunity for internal review and there was no issue concerning the characterization of that process as quasi-judicial. These indicia of an established administrative process and the court's characterization of that process as leading to a "quasi-judicial decision" (*id.* at p. 407) sharply and readily distinguish *Mola* from the instant case, in which it is the very existence of an adjudicatory process leading to a quasi-judicial decision that is at issue.

formal quasi-judicial decision or findings to which to subscribe preclusive effect in a later action so as to bar it. And we have found none.

### B. *The Summary Judgment Motion Below*

Concerning their claim that they were entitled to summary judgment based on application of the doctrine of exhaustion of judicial remedies, the Agency and Grayson argued below in three paragraphs that because YKA claimed that they had deprived it of due process in the form of an evidentiary hearing, YKA was required to have petitioned for relief in mandate before pursuing a legal action against them under 42 United States Code section 1983, and it had failed to do so. There was no argument or analysis devoted to the preliminary question whether the doctrine of exhaustion of judicial remedies even applies on the facts of this case. This, despite the allegation in YKA's cross-complaint—the pleading that framed the issues on summary judgment—that there was no requirement for it to pursue prior judicial action or relief before proceeding with its section 1983 claim for damages.

And the moving parties included no facts in their separate statement that might establish either (1) the application of the doctrine here due to the existence of a quasi-judicial decision adverse to YKA that was reached after resort to available or established administrative procedures possessing a judicial character or (2) YKA's actual failure to have petitioned for relief in mandate.[26] Indeed, the undisputed evidence on the motion, as demonstrated by YKA's opposition, showed that no one understood there to have been any operative or established administrative procedure whereby YKA's obligation to pay prevailing wages as calculated by the Agency, or the amounts potentially owing to its workers as prevailing wages under the DDA, could be adjudicated and no operative contracts provided for such a procedure, let

---

[26] We acknowledge that on February 4, 2008, this court granted, over YKA's opposition, the Agency and Grayson's request for judicial notice of documents purportedly printed from the superior court's civil information system Web site in December 2007 and offered to show the absence of a writ petition filed by YKA in that system. First of all, these documents were not made part of the summary judgment motion and were not before the trial court when it considered that motion. (See, e.g., *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [48 Cal.Rptr.2d 87, 906 P.2d 1242] [appellate court ordinarily confines its review to matters that were actually before the trial court; while it may grant judicial notice of matters not before the court below, it need not do so, especially when the matters should have been presented to the trial court for its consideration].) Secondly, it is only by inference that one can use the documents to point to the absence of such a writ proceeding on the superior court's live docket—the documents themselves do not establish this fact. For these reasons, we consider judicial notice of the documents to have been improvidently granted. And, even when judicial notice has been appropriately granted, we are not obliged to consider the matters so noticed. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261].) We accordingly have not considered these documents in the course of our review.

alone one possessing the requisite judicial character. Significantly, the undisputed evidence submitted on the motion also showed that there was no direct factual finding or decision by the Agency that was adverse to YKA because the Agency ultimately recognized that it could not enforce the DDA's prevailing wage clause against YKA but could only do so against the developer, who is not a party to this action.[27] And the evidence was disputed as to whether the Agency had actually withheld from the developer contract or retention funds due YKA to cover the prevailing wage dispute over its workers, or if the developer itself withheld funds from YKA, whether it did so at the direction of the Agency.

As we have shown, the doctrine of exhaustion of judicial remedies operates by affording preclusive effect to a prior quasi-judicial decision or findings reached after resort to an available administrative process possessing a judicial character. Thus, in order to prevail on this ground, or even to shift the burden on the motion, it was necessary for the Agency and Grayson to affirmatively demonstrate as part of their summary judgment moving papers that, indeed, there existed such a process here and that such process had yielded a quasi-judicial decision or findings adverse to YKA. It was further incumbent upon the moving parties in order to prevail on this ground, or to even shift the burden on the motion, to establish with undisputed evidence that YKA had in fact failed to challenge an adverse quasi-judicial decision or findings such that these matters were afforded preclusive effect so as to bar this action. These factual predicates were required to be affirmatively shown in order for the Agency and Grayson to demonstrate their entitlement to summary judgment as a matter of law, i.e., to carry their burdens of production and persuasion on the motion as set out in *Aguilar* and the summary judgment statute, with respect to the doctrine of exhaustion of judicial remedies. Yet they offered no evidence on either matter and failed to include any material fact in their separate statement that went to either of these issues.[28] The trial court's written order granting the motion acknowledged that the moving parties had included no evidence that YKA had failed

---

[27] That there was no such direct adverse finding or decision may or may not have implications with respect to the merits of YKA's substantive claim of deprivation of rights under color of state law. But because we view this record as insufficient on which to resolve that issue and others, we decline to accept the Agency and Grayson's invitation to exercise our discretion under section 437c, subdivision (m)(2) to address any other bases on which summary judgment was sought, or might have been sought, but not granted as alternate grounds for affirmance of the judgment. In view of the result here, we likewise perceive it as unnecessary to address other grounds on which YKA contends the judgment should be reversed, such as that a petition for writ of mandate is an improper remedial manner in which to compel performance of a contract.

[28] The parties devote portions of their briefing to the "Golden Rule" of summary judgment as discussed in *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 310 [125 Cal.Rptr.2d 499] (*San Diego Watercrafts*) and other cases. This rule enforces section 437c, subdivision (b)'s requirement that the summary judgment moving papers must

to file a petition for relief in mandate, but the court granted the motion nonetheless, having erroneously shifted the burden to YKA to affirmatively show that it had pursued such relief.

Moreover, the undisputed evidence submitted by YKA in opposition concerning the character of the "proceedings" demonstrates a decisionmaking process so lacking in adjudicatory or quasi-judicial characteristics as to fall well short of what is required in order to ascribe preclusive effect to any determinations made in the process. There was no established administrative procedure by which to have a claim heard; there were no available mechanisms by which YKA could properly evaluate the "evidence" against it, let alone subject adverse evidence to some form of cross-examination; there was no formal hearing or established procedure, regulation, contract, or authority that required a hearing; YKA was not afforded the opportunity to subpoena, call, or examine witnesses; there was no record of the proceedings; there were no particular findings or manner in which to seek internal review of findings; and there was no actual decision directly adverse to YKA of which review could be sought or that could be given preclusive effect against YKA in this action. Although YKA was able to submit to the Office documentary evidence and argument in support of its positions that it did not owe its workers prevailing wages or that their timekeeping records were erroneous, this fact alone is simply not enough to render the character of Grayson's "decision" that the workers were owed certain amounts by the developer under the DDA judicial or quasi-judicial in character. (*Pacific Lumber, supra,* 37 Cal.4th at p. 944; *State Bd. of Chiropractic Examiners v. Superior Court, supra,* 45 Cal.4th at pp. 975–976.) The Agency and Grayson cite no authority that would lead to this result and we have found none.[29]

---

" 'include a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed.' " (*San Diego Watercrafts,* at p. 313.) The rule limits the court's consideration on the motion to facts set out in the separate statement, regardless of whether other facts are established as undisputed by evidence submitted with the moving papers—if the fact is not set out in the separate statement, it does not exist. (*Ibid.*) *San Diego Watercrafts* interpreted the "strictly applied rule" as being inconsistent with section 437c, subdivision (c), which requires the court to consider all admissible evidence on the motion, and reconciled the two parts of the statute so that a court has the discretion on a motion for summary judgment to ignore evidence not identified in the separate statement. (102 Cal.App.4th at p. 314.) We do not see this rule as having particular relevance here, where there were no facts included in the moving parties' separate statement about the existence of an adjudicatory or quasi-judicial decision adverse to YKA or its failure to have sought review of such a decision in mandamus *and* no evidence establishing either fact. In other words, there was no evidence on the relevant issues outside that cited in the moving parties' separate statement for the court to consider in the exercise of its discretion.

[29] They do cite *Briggs* for the proposition that the standard for determining whether an act is quasi-judicial is "whether the administrator is applying general standards to a particular factual situation." But the point that the court in *Briggs* was making was that the city council's decision there was quasi-adjudicatory *as opposed to legislative* in character such that section

■ Accordingly, on this record, the moving papers did not establish as a matter of law the Agency and Grayson's right to summary judgment on the basis of the doctrine of exhaustion of judicial remedies. (*Aguilar, supra*, 25 Cal.4th at pp. 854–855; § 437c, subd. (p)(1), (2).) This being the case, the court should have stopped at the second step of the summary judgment analysis—examination of the motion to determine if the moving parties had established facts justifying judgment in their favor—after concluding that the Agency and Grayson had not carried their burden of production. And it follows that the court should not have proceeded to require YKA as the opposing party to demonstrate anything in order to defeat the motion. Because the burden of production never shifted to YKA to either show a triable issue of material fact or prove its claim by overcoming judicial exhaustion principles, the trial court should not have applied section 437c so as to have required YKA to have done either. On this record, the court's ultimate grant of summary judgment against YKA based on the doctrine of exhaustion of judicial remedies therefore constituted error.

The Agency and Grayson contended at oral argument and in supplemental briefing that even if the doctrine of exhaustion of judicial remedies does not apply here due to the absence of an adjudicatory, quasi-judicial decision reached after an administrative process possessing the requisite judicial character, YKA has waived this basis for reversal by expressly conceding the application of the doctrine and by failing to raise this particular argument below or on appeal. Not so.

It is true that YKA made statements in briefing here and below that acknowledged a *general* requirement of pursuing relief in mandate before suing a governmental entity to compel official action or for damages for civil rights violations.[30] But after each such statement, YKA went on to argue that

1094.5 *as opposed to section 1085* applied for purposes of mandamus review of the decision. (*Briggs, supra*, 40 Cal.App.4th at pp. 648–649.) This distinction and characterization of a decision do not relate to the precise issue here—whether the Agency's process and "decision" possessed the requisite judicial character such that the doctrine of exhaustion of judicial remedies bars the action—and *Briggs* thus offers no support for the argument that they do.

[30] Its opposition to summary judgment included the qualified statement that "*generally*, a party is required to file a writ of mandate as a prerequisite to compel a governmental body to act under its official capacity [(*Briggs, supra*, 40 Cal.App.4th 637)], even, at times, requiring the filing of a writ of mandate to compel a government agency to hold a hearing in the first place[. (*Mobley, supra*, 90 Cal.App.4th 1221.)]" (Italics added.) In its opening brief, YKA likewise stated, "California law contains a judicially mandated prerequisite to the filing of *most* 42 U.S.C. section 1983 lawsuits—the filing of a writ of mandate lawsuit before instituting a claim for damages ([*Briggs, supra*; *Mobley, supra*]). *Generally* a party is required to file a writ of mandate as a prerequisite to compel a government body to act under its official capacity ([*Briggs, supra*].)" (Italics added.) And in its reply brief, YKA made a similar statement, which was followed by the qualifier that "if mandate is an ineffective remedy, the reason for the rule ceases."

the requirement did not apply here, in part because it was the Agency's policy not to provide a hearing and no internal review of Grayson's decisions concerning the payment of prevailing wages on the project was available. Broadly construed,[31] this argument points to the inadequacy of the administrative or adjudicative process used and the consequent threshold question whether YKA was even required to proceed in mandate before filing suit due to the absence of any proceedings or decision possessing a judicial or quasi-judicial character. And YKA's argument, though perhaps imprecisely articulated, was bolstered by its having included evidence in opposition to the motion and additional undisputed facts in its separate statement that demonstrated the absence of an established adjudicatory process or procedure possessing the requisite judicial character in connection with the Agency's efforts to enforce the prevailing wage provision in the DDA on the project. This was enough to avoid any asserted waiver of the argument that the doctrine of exhaustion of judicial remedies did not apply here due to the nature of the process by which the Agency reached its prevailing wage decision concerning YKA's workers.

But more fundamentally, because the Agency and Grayson obtained judgment not by trial but instead by summary judgment, in order to shift the burden on the motion or to prevail based on the argument that the doctrine of exhaustion of judicial remedies barred YKA's cause of action, it was necessary for these moving parties to affirmatively demonstrate their entitlement to judgment as a matter of law on this basis.[32] To do so, it was incumbent *on them* to show as a preliminary matter that the doctrine applied here by demonstrating, with undisputed facts, that there was a prior administrative proceeding possessing the requisite judicial character and yielding a decision adverse to YKA such that res judicata principles could be fairly invoked to bar the action. (*Pacific Lumber, supra*, 37 Cal.4th at p. 944; *State Bd. of Chiropractic Examiners v. Superior Court, supra*, 45 Cal.4th at pp. 975–976.)

In other words, because demonstrating the very applicability of the doctrine here was an inherent part of showing their entitlement to judgment on

---

[31] We emphasize that on summary judgment, we, like the trial court, strictly construe the moving papers and liberally construe the opposing papers. This means here that we view the moving papers below in the light most favorable to appellant YKA and all doubts about the propriety of granting of the motion are resolved in its favor. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206 [74 Cal.Rptr.3d 570, 180 P.3d 321]; *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717 [68 Cal.Rptr.3d 746, 171 P.3d 1082]; *Kasparian v. AvalonBay Communities* (2007) 156 Cal.App.4th 11, 19 [66 Cal.Rptr.3d 885].)

[32] General waiver principles cited by the Agency and Grayson and as discussed in *Penn v. Prestige Stations, Inc.* (2000) 83 Cal.App.4th 336, 345, footnote 2 [99 Cal.Rptr.2d 602], a case where arguments were raised for the first time on appeal after a jury trial, are therefore not applicable here.

this basis, it was necessary for the moving parties to affirmatively establish the factual conditions or predicates to such applicability by undisputed facts in order to shift the burden on the motion to YKA. The consequence of the Agency and Grayson's failure to have done so is that the motion should have been denied *regardless of the content of YKA's opposition*. Because this was summary judgment where the *moving party* must demonstrate entitlement to judgment in order to meet its burden of production on the motion and must do so as a condition precedent to the burden being shifted to the opponent, YKA cannot be said to have waived the argument by not having raised it below. The three-step process that a trial court must use in analyzing a summary judgment motion requires the court to hold the moving party to its initial burdens of production and persuasion in demonstrating its entitlement to judgment as a matter of law on a particular basis. (*Chavez v. Carpenter, supra*, 91 Cal.App.4th at p. 1438; *Turner v. Anheuser-Busch, Inc., supra*, 7 Cal.4th at pp. 1252–1253.) The court's assessment of whether the moving party has carried its burden—and therefore caused a shift—occurs *before* the court's evaluation of the opposing party's papers. (§ 437c, subd. (p)(1), (2); *Aguilar, supra*, 25 Cal.4th at pp. 854–855.) Therefore, the burden on the motion does not initially shift as a result of what is, or is not, contained in the opposing papers. And because a reviewing court employs the same three-step process in the course of its de novo review of a summary judgment (*Chavez v. Carpenter, supra*, 91 Cal.App.4th at p. 1438),[33] this conclusion applies with equal force on appeal. We accordingly reject the Agency and Grayson's contention that arguments against the applicability of judicial exhaustion principles have been waived or are beyond the scope of our review.[34]

Because summary judgment deprives a party of his or her right to a jury trial, the erroneous granting of a motion will ordinarily be reversible error and will be found harmless only where the trial court's error was purely technical. Here, the trial court erred by shifting the burden of production to YKA; this error was not purely technical or harmless and it thus requires reversal of the judgment. (*Hawkins v. Wilton, supra*, 144 Cal.App.4th at p. 943.)

---

[33] Under this standard of review applicable to the grant or denial of summary judgment, we independently determine the construction and effect of the facts presented to the trial judge as a matter of law. (*Kolodge v. Boyd* (2001) 88 Cal.App.4th 349, 355–356 [105 Cal.Rptr.2d 749].)

[34] We further note that in any case, appellate courts enjoy broad discretion *not* to hold an appellant to an implied waiver and may entertain an issue on appeal that might otherwise have been deemed waived by inaction or omission. (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].)

## DISPOSITION

The judgment is reversed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.